IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLOS ROBLES, | : | CIVIL ACTION NO. **1:CV-10-2663** |
| | : | |
| Plaintiff | : | (Chief Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| J.J. CASEY, *et al.*, | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

## I. BACKGROUND.

We incorporate herein the procedural and factual background of this case detailed in our recent Report and Recommendation ("R&R") filed on August 29, 2012, addressing Defendant Dr. Bohinski's Doc. 73 Summary Judgment Motion. (Doc. 89).

Both Defendant Dr. Bohinski's Document 73 Summary Judgment Motion and the Corrections Defendants' **Document 66** Summary Judgment Motion are ripe for disposition.[1] In our August 29, 2012 R&R, we recommended that Defendant Dr. Bohinski's Doc. 73 Motion for Summary Judgment be granted with respect to Plaintiff's remaining medical professional liability claims against him. Corrections Defendants are employees of the Pennsylvania Department of Corrections ("DOC") at SCI-Dallas, and are as follows: Food Service Manager Davis; Food Service Manager Jones; Food Service Instructor Casey; and Registered Nurse ("RN") Supervisory Leskowsky.

This Report and Recommendation will address only the Corrections Defendants' dispositive motion. We now examine that motion.

---

[1]Dr. Bohinski and the Corrections Defendants are represented by separate counsel.

## II. SUMMARY JUDGMENT STANDARD.

A motion for summary judgment may not be granted unless there is not genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the suit. *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004). The moving party may demonstrate that no genuine dispute as to any material fact exists by citing to pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. Fed. R. Civ. P. 56(c). The reviewing court may consider any materials in the record in determining whether there exists a genuine issue of material fact. Fed. R. Civ. P. 56(c)(3). An issue of fact is "'genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The burden of proving lack of genuine issue of material fact is initially on the moving party. *Childers*, 842 F.2d at 694 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The burden of proof shifts to the nonmoving party, however, when the moving party demonstrates no such genuine issue of fact. *Forms, Inc. v. Am. Standard, Inc.*, 546 F. Supp. 314, 321 (E.D. Pa. 1982), *aff'd. mem.*, 725 F.2d 667 (3d Cir. 1983). The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

In determining the existence of an issue of material fact, the reviewing court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). As such, the court must accept the nonmoving party's allegations

as true and resolve any conflicts in his or her favor. *Id.* (*citing Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977)).[2]

## III. ALLEGATIONS OF SECOND AMENDED COMPLAINT (DOC. 17).

We incorporate herein the Allegations of Plaintiff's Second Amended Complaint from our August 29, 2012, Report and Recommendation addressing Defendant Dr. Bohinski's Summary Judgment Motion. (Doc. 89).

## IV. MATERIAL FACTS.

As stated, this Report and Recommendation will address only the Corrections Defendants' **Document 66** Motion for Summary Judgment. In support of their Motion, the Corrections Defendants filed a Statement of Material Facts ("SMF") (Doc. 68, ¶'s 1-67), a Brief in Support (Doc. 67), and an Appendix containing Plaintiff's deposition, Declarations from Defendants, and other exhibits. (Doc. 69). On May 3, 2012, Plaintiff filed his Opposition Brief and Response to Defendants' SMF. (Docs. 74 & 75). On May 17, 2012, Corrections Defendants filed their Reply Brief. (Doc. 78). On July 10, 2012, Plaintiff submitted his 14-sentence Unsworn Declaration. (Doc. 84).

As mentioned, the remaining Corrections Defendants are: Defendant Casey, Food Service Instructor; Defendant Davis, former Food Service Manager; Defendant Jones, Food Service Manager; and, Defendant Leskowsky, Registered Nurse Supervisor. (Doc. 68, p. 1, ¶ 2 & Doc. 74,

---

[2]*See also Allen v. Fletcher*, Civil Action No. 3:07-0722, 2009 WL 1542767, at *2 (M.D. Pa. June 2, 2009)(outlining the summary judgment standard).

¶ 2).  The Court has allowed the following of Plaintiff's claims to proceed as against Corrections

Defendants:  (1) Plaintiff's Eighth Amendment claims against Defendants Davis and Jones arising

from his July 25, 2010 alleged eye injury after the chemical splashing incident; (2) Plaintiff's Eighth

Amendment denial of proper medical care claims against Defendant Leskowski arising from his July

25, 2010 alleged eye injury; and  (3) Plaintiff's Eighth Amendment state-created danger claim

against Defendant Casey regarding his July 25, 2010 chemical splashing accident and alleged eye

injury.  (Doc. 23).

Corrections Defendants properly filed their Statement of Facts ("SMF")  with citation to the

evidence  (Doc. 68), as required by Local Rule 56.1, M.D. Pa.[3]  Also, Corrections Defendants

submitted exhibits with their SMF to support each one of their contentions.  (Doc. 69, Atts. 1-7).

Plaintiff filed his Response to Corrections Defendants' SMF.  (Doc. 74).   Additionally, Plaintiff

admitted (in whole and in part) to several of Corrections Defendants' SMF.  (*See* Doc. 74, ¶'s 1-11,

13-18, 22-24, 28, 31-33, 35, 40, 43, 45, 47 (improperly numbered as ¶ 47), 48, 49, 50, 52, 54-61,

and 63-67.  Some of Plaintiff's Responses to Corrections Defendants' SMF did not match with

Corrections Defendants' numbered SMF, eg., ¶ 37 of Plaintiff's Response seems to correspond with

Corrections Defendants' SMF ¶ 36 and ¶ 38 of  Plaintiff's Response seems to correspond with

Corrections Defendants' SMF ¶ 37.  Also,  Plaintiff did not have numbered Responses to some of

Corrections Defendants' SMF, eg., ¶'s 29 and 36 are missing, and Plaintiff's Response contains two

---

[3]In his Response to Corrections Defendants' SMF (Doc. 74), Plaintiff did not cite to the
evidence in the record with respect to all of the SMF which he denied as required by Local Rule
56.1, M.D. Pa. Corrections Defendants' Statement of Facts properly cites to the evidence in the
record to support each fact as required.  (Docs. 68 & 69). As such, we will accept all of
Corrections Defendants' Statement of Facts which are supported by the undisputed evidence.

¶'s 17 and 47.  Plaintiff's first ¶ 17 relates to Corrections Defendants' ¶ 16.

Corrections Defendants' 67-paragraph Statement of Facts (Doc. 68) comports with Local Rule 56.1, M.D. Pa., since it states the separate facts in separate numbered paragraphs and cites to the evidence for support of each paragraph.  However, as noted, Plaintiff's Response to Corrections Defendants ' Statement of Facts does not properly cites to the evidence in the record regarding all of Plaintiff's denials as required as required by Local Rule 56.1, M.D. Pa.  (Doc. 74). *See Cyrus v. Laino*, Civil No. 08-1085, M.D. Pa.; *Cyrus v. Freynik*, Civil No. 08-2278, M.D. Pa.; *Michatavi v. Martinez*, 2009 WL 5172962 (M.D. Pa.); *Hemingway v. Ellers,* 2008 WL 3540526 (M.D. Pa.)*; Accolla v. U.S.*, 2009 WL 3625383 (M.D. Pa.), affirmed 2010 WL 763550 (3d Cir.)(court found that since Plaintiff inmate in civil rights action did not properly respond to prison staff Defendants' statement of facts as required by L.R. 56.1, M.D. Pa., Defendants' statement of facts were undisputed).

Since Corrections Defendants have properly filed their SMF in support of their Summary Judgment Motion (Doc. 68), as required by Local Rule 56.1 of M.D. Pa., and their facts are all properly supported by evidence, and since Plaintiff failed to properly deny some of Corrections Defendants' SMF, we shall accept all of Corrections Defendants' facts which are not disputed by the admissible evidence.  Also, as Corrections Defendants correctly point out in their Reply Brief (Doc. 78, p. 6), to the extent Plaintiff attempts to rely upon inadmissible hearsay statements in his documents opposing their Summary Judgment Motion (*i.e.*, Docs. 74 & 75), the Court should not consider them as creating genuine disputes of material facts.  *See Countryside Oil Co., Inc., Travelers Ins. Co.*, 928 F.Supp. 474, 482 (D.N.J. 1995)("It is well settled that only evidence which is

admissible at trial may be considered in ruling on a motion for summary judgment.")(citation omitted). "In [the Third Circuit], hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." *Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 223, n. 2 (3d Cir. 2000)(citation omitted). Thus, Plaintiff cannot rely upon inadmissible hearsay statements to oppose Corrections Defendants' Summary Judgment Motion as he, in part, attempts to do. Regardless of Plaintiff's failure to properly deny some of Corrections Defendants' Statement of Facts by citing to evidence and regardless of Plaintiff's partial reliance upon inadmissible hearsay statements, we accept Corrections Defendants' statements of facts which are supported by their evidence and which are not disputed by admissible evidence. (Doc. 69).

Corrections Defendants assert the following relevant facts derived from the deposition of Plaintiff. (Doc. 68). Sometime in 2007 or 2008, Plaintiff began working in the kitchen at SCI-Dallas. (Doc. 68, p. 2, ¶ 4). While Plaintiff worked in the kitchen, his duties included cooking and cleaning, and Plaintiff worked for Defendant Casey on many occasions. (*Id.* at ¶¶ 4,5). In the kitchen, the inmate-workers used a bottled, bright red cleaning fluid to clean up grease, but Plaintiff does not remember the name of that fluid. (*Id.* at ¶ 6). Plaintiff stated that he learned his duties as a cook while he was on the job in the kitchen at SCI-Dallas. (*Id.* at 7) (*See also* Doc. 74, ¶'s 4-7).

Sometime after Plaintiff first began working in the kitchen, he ceased his kitchen job in 2007 or 2008 to work in the shoe repair shop. (*Id.* at ¶ 4). Plaintiff held his job in the shoe repair shop for almost three (3) years and stopped working there at some point during 2009. (*Id.* at 8). In 2010, Plaintiff began working again in the kitchen. (*Id.*).

In his Response Statement of Facts, Plaintiff admits that he worked in both the kitchen and the shoe repair shop. (Doc. 74, pp. 1-2, ¶ 4). Plaintiff further submits that while he cooked and cleaned with various detergents in the kitchen, he was never notified of what the detergents actually were or whether any safety precautions should be taken while using them. (*Id.* at ¶¶ 4, 6). Plaintiff notes that he could not learn information on the cleaning chemicals on his own because "he does not read English and does not competently speak English." (*Id.* at ¶ 6).

On July 25, 2010, Plaintiff was working in the kitchen for a second time as a cook, starting at 5:00 a.m. with no set end time. (Doc. 68, p. 3, ¶ 10). At some point during his shift, Defendant Casey provided Plaintiff with a bucket full of the bright red liquid to clean up grease. (*Id.*). Plaintiff averred that he had not used this liquid before, although he had observed it in the storage room. (*Id.*). While cleaning, some of the liquid "spilled" into his eye. (*Id.*). After informing Defendant Casey of his injury, Defendant Casey sent Plaintiff the prison's medical center. (*Id.*). Plaintiff was later sent to a hospital outside the prison. (*Id.*). Plaintiff admitted these facts. (*See* Doc. 74, ¶ 10).

According to the Corrections Defendants, Plaintiff admitted that goggles and other protective eye wear were always available in the kitchen at SCI-Dallas. (Doc. 68 at ¶ 11). Although Plaintiff was not wearing safety goggles on or before July 25, 2010, he stated that he did wear them while working after the chemical splashing incident. (*Id.*). Plaintiff further admitted that he did not request goggles on July 25, 2010, and that he added water to the red chemical before using it. (*Id.*). The Corrections Defendants claim that on July 26, 2010, Plaintiff returned to the kitchen to find out if he could still work there. (*Id.* at ¶ 12).

In his Response to Defendants' Statement of Facts, Plaintiff admits that safety goggles were kept in the kitchen but states that they were unavailable to him because they were always locked in the office. (Doc. 74, pp. 3-4, ¶ 11). Plaintiff further notes that no one ever wore goggles while cleaning with chemicals because prison staff did not notify them of the goggles' necessity. (*Id.*) Plaintiff additionally affirms that he neither wore nor asked for goggles on July 25, 2010. (*Id.*). Insofar as Plaintiff returned to work in the kitchen on July 26, 2010, Plaintiff notes that he "is a prisoner who according to DOC policy must report to his prescribed work area unles (sic) laid in from were [sic] by medical order." (Doc. 74, p. 4, ¶ 12). Because Plaintiff was not "laid in" upon returning to SCI-Dallas after visiting Wilkes-Barre General Hospital, he was required to report back to the kitchen for work "or he would have been issued a misconduct for refusing to work and would have then been placed in the Restrictive Housing Unit of the Facility as per policy." (*Id.*). Plaintiff asserts that he reported to the kitchen on July 26, 2010, "and informed them that he was not capable of working." (*Id.*).

On August 1, 2010, Plaintiff filed with Grievance No. 328561 at SCI-Dallas, which related to the chemical incident on July 25, 2010. (Doc. 68, p. 4, ¶ 13 & Doc. 69, p. 145). Plaintiff stated that he is not aware of any other inmates being similarly injured in the kitchen. (*Id.*). Plaintiff admitted these facts. (*See* Doc. 74, ¶ 13).

The Corrections Defendants assert that when asked about his claim that inmates at SCI-Dallas were asked to falsify documentation regarding safety training, Plaintiff could not say how

many inmates were asked to sign these documents. (Doc. 68 at ¶ 14).[4]

After the incident on July 25, 2010, Plaintiff underwent an excision on his right eye for a condition called pterygium, a procedure for which he was approved weeks earlier. (*Id.* at ¶ 15).

In his Response to Corrections Defendants' ¶ 15 of their Statement of Facts, Plaintiff submits:

> The Plaintiff has suffered from an acute eye problem that resulted in a covering of his lid with a cloud that obscured his vision. The plaintiff reported this problem repeatedly to the medical staff of the facility. See: Defendant's (sic) Exhibits of Medical Records at Progress Notes dated entry of 7/20/06. At that time the Plaintiff reported a severe infection and Defendant Bohinski personally approved and verified reviewing the determinations of the Physician's Assistants at that time as noted by his stamp after reviewing the files of the plaintiff.
>
> Furthermore, he was informed by the defendant that he could not get treatment to remove the problem until it completely obscured his vision. The[n] even after his vision was obscured he suffered an inordinate delay in having the appropriate treatment unitl (sic) after he had received the injuries now complained of, and ONLY as a result of getting the injuries that he had warned medical staff about due to lack of safety equipment in the kitchen area as best he could without an interpreter.
>
> It is affirmed that the plaintiff was supposed to have been operated on, and staff continuously failed to follow up on his getting the operation [he] was recommended by specialists until AFTER the accident to cover up their negligence.

(Doc. 74, pp. 5-6, ¶ 15).

According to Corrections Defendants' Exhibits regarding Plaintiff's Medical Records at Progress Note dated 7/20/06, Plaintiff reported a left ear infection to the prison's Physician Assistant ("PA") and not an eye problem. (Doc. 69, p. 144). The PA found Plaintiff's external ear canal was

---

[4]In response, Plaintiff states that "as there are hundreds of inmates he could not give a specific number since this was done during shifts when he was not working as well as during the shift where he personally watched every inmate on his shift be instructed to sign a document confirming that they had received training that was never given to them, including himself." (Doc. 74, pp. 4-5, ¶ 14).

infected and prescribed him an antibiotic. (*Id.*). Defendant Dr. Bohinski verified the PA's treatment.

Plaintiff stated that he named RNS Leskowsky as a Defendant because "all of them work in the same union there," that he named Mr. Casey as a Defendant because he was responsible for the chemicals, that he named Mr. Davis as a Defendant because he formerly ran the kitchen, and that he named Mr. Jones as a Defendant because he was currently one of the kitchen's supervisors. (Doc. 68, p. 4, ¶ 16).

In his Response, Plaintiff adds that he sued Defendant Leskowsky because Defendant Leskowsky "ordered him to be removed from the [outside] hospital before seeing the optometrist who was supposed to examine him." (Doc. 74, pp. 6-7, ¶ 17 (sic)). As indicated above, Plaintiff's first ¶ 17 of his Response relates to Corrections Defendants' SMF ¶ 16.

The Corrections Defendants submit that Defendant Casey, currently a Food Service instructor at SCI-Dallas, has been employed in that capacity since May 9, 1994. (Doc. 68, p. 4, ¶ 17). Defendant Casey generally works from 4:30am until 12:30 pm, supervising between fifty (5) and sixty (60) inmate-workers. (Doc. 68, p. 5, ¶ 18). Defendant Casey is responsible for "the care, custody and control of inmate kitchen workers and the preparation of meals for the inmate population." (*Id.*). Plaintiff admitted Corrections Defendants' SMF ¶'s 17-18. (Doc. 74, ¶'s 17 (second one) & 18).

According to the Corrections Defendants, citing to Defendant Casey's Declaration (Doc. 69, Att. 4, pp. 82-85), inmates working in the prison kitchen are provided with "initial job orientation" prior to their first shift, which includes reviewing "safety and sanitation procedures ... regarding use

of safety glasses or goggles, gloves and aprons [which] are available in the butcher shop area of the kitchen." (Doc. 68 at ¶ 19). Inmates working in the kitchen are directed to use this protective wear while cleaning. (*Id.*). Upon completion of the orientation, these inmates must sign a document reflecting that they underwent "the job assignment orientation." (*Id.*).

In his Response, Plaintiff denies that inmates working in the kitchen receive orientation or instructions in either English or Spanish. (Doc. 74, p. 7, ¶ 19). Plaintiff claims that inmate-workers "are called to the kitchen and given a paper to sign and immediately start work." (*Id.*). Plaintiff additionally notes that any safety equipment is unavailable to the inmates, as it remained locked up, and that "inmates are NEVER told to wear safety equipment." (*Id.*). Plaintiff did not cite to any evidence in the record to support his denial of Corrections Defendants' SMF ¶ 19 which was supported by Defendant Casey's Declaration. However, in his Declaration, Plaintiff avers that prior to the July 25, 2010 incident, he requested eye wear to protect his eyes but was denied. (Doc. 84, ¶ 6).

The Corrections Defendants maintain that the safety gear was "provided to clean and sanitize the butcher shop area, as per Hazards Analysis and Critical Control Points ("HACCP") procedures." (Doc. 68, p. 5, ¶ 20). Corrections Defendants' SMF ¶ 20 was supported by Defendant Casey's Declaration. Plaintiff denies this assertion without citation to evidence. (Doc. 74, p. 7, ¶ 20).

Defendant Casey is acquainted with Plaintiff, who has worked in the kitchen for a few years. (Doc. 68, pp. 5-6, ¶ 21). The Corrections Defendants assert that while Spanish is Plaintiff's main language, he is capable of communicating in English as well. (*Id.*). Corrections Defendants' SMF ¶ 21 was supported by Defendant Casey's Declaration.

In response, Plaintiff denies and further submits:

It is well documented in the medical records provided that it was necessary for Mr. Robles to speak through an interpreter and while Mr. Jones has been Plaintiff's supervisor, he has had numerous Spanish speaking inmates explain things to him because he does not speak english [sic] well, or understand English well either.

(Doc. 74, p. 8, ¶ 21).   Plaintiff did not cite to evidence to support his denial of Defendants' ¶ 21.

(Doc. 74, p. 8, ¶ 21).  Also, we do not find in the medical records Defendants provided (Doc. 69, pp. 116-144) that it was necessary for Plaintiff Robles to speak through an interpreter.  However, at his deposition, Plaintiff Robles testified through an interpreter.  (Doc. 69, Att. 1).

On May 28, 2010, Plaintiff signed a document reflecting that he had completed his "Initial Inmate Job Assignment Orientation" to work in the kitchen. (Doc. 68, p. 6, ¶ 22). In his Response, Plaintiff admits that he had been provided with such a document but further submits that he "did not know what they were as he does not read english (sic) and at no time did he receive any training." (Doc. 74, p. 8, ¶ 22).

The Corrections Defendants state that on July 25, 2010, Plaintiff approached Defendant Casey at approximately 10:40am and informed him that a chemical had splashed in his eyes while he was mixing it in a bucket with water. (Doc. 68, p. 6, ¶ 23).[5]  When Defendant Casey asked Plaintiff whether he had flushed his eye with water, Plaintiff answered in the affirmative, to which Defendant Casey directed Plaintiff to rinse again. (*Id*.). Plaintiff admitted these facts.  (Doc. 74, ¶ 23). Defendant Casey then sent Plaintiff to the prison's infirmary for treatment and noted that Plaintiff did not appear to be in pain and was able to open his eyes. (Doc. 68 at ¶ 24). Defendant

---

[5] The Corrections Defendants submit that the chemical at issue is named "New GR Germicidal Rinse." (Doc. 68, p. 7, ¶ 26).

Casey notes that he did not observe the incident itself. (*Id.*).

Plaintiff affirms that he was sent to the infirmary after this incident and that Defendant Casey did not actually witness the incident but, he denies that he was not experiencing pain. (Doc. 74, p. 8, ¶ 24).

After sending Plaintiff to the infirmary, Defendant Casey called the nurse on duty to notify the nurse of the incident and read the nurse "the precautionary statement from the bottle/container of disinfectant." (Doc. 68, pp. 6-7, ¶ 25). Defendant Casey copied the disinfectant's Material Safety Data Sheet and provided the nurse with that copy. (*Id.*). Also on July 25, 2010, Defendant Casey completed an Employee Incident Report. (Doc. 68, p. 7, ¶ 27).

Defendant Casey notes that this is the first occurrence of which he is aware where an inmate was injured by a chemical while working in the kitchen. (*Id.* at ¶ 28). Defendant Casey does not find that the disinfectant posed a risk of harm to Plaintiff or the other inmates. (*Id.*).[6] Defendant Casey further submits that while safety goggles were available on July 25, 2010, he does not believe that Plaintiff was wearing them that day. (*Id.*).[7] Finally, Defendant Casey avers that he never requested inmates to falsify any documentation regarding kitchen safety training. (*Id.* at ¶ 29).

In his Response, Plaintiff submits that the Corrections Defendants acted together to direct all inmates working in the kitchen to sign a form indicating that they had been provided with safety

---

[6] Plaintiff finds this assertion to contradict the safety protocols submitted by Defendant Casey as an exhibit. (Doc. 74, p. 9, ¶ 28).

[7] Plaintiff denies that safety goggles were accessible and affirms that he was not wearing any on July 25, 2010. (Doc. 74, p. 9, ¶ 28).

training. (Doc. 74, p. 9, ¶ 30).[8]  Plaintiff states that if an inmate refused to sign this form, he would have been fired, received a misconduct, and been sent to the Restrictive Housing Unit. (*Id.*).

The Corrections Defendants additionally submit that Defendant Davis, formerly a Food Service Manager 2 at SCI-Dallas, held his position from 1990 until December 25, 2010. (Doc. 68, p. 7, ¶ 30). During his employment, Defendant Davis "was responsible for the overall operation of the Food Service Department at SCI-Dallas, including food safety and sanitation measures." (Doc. 68, p. 8, ¶ 31). Defendant Davis was responsible for: twenty-two (22) Food Service Instructors, including Defendants Casey; four (4) Food Service Supervisors; and one (1) Food Service Manager 1, including Defendant Jones. (*Id.*).

According to the Food Service Procedures Manual issued by the Department of Corrections ("DOC"), a Food Service Manager is charged with providing all inmate-workers with orientation and instruction, including that of the appropriate "safety procedures and the 'safe and proper way to use, clean, and sanitize all food service equipment.'" (*Id.* at ¶ 32). The Corrections Defendants note that all hazardous chemicals used in the kitchen are to be "maintained in accordance with Department policy 15.1.1 'Safety.'" (*Id.* at ¶ 33).

Plaintiff admitted ¶ 31-33 of Correction Defendants' SMF.  (Doc. 74).

In his position, Defendant Davis made sure that all inmate kitchen workers received the proper orientation with a review of safety and sanitation procedures, after which these inmates acknowledged completion of the orientation by signing a form. (Doc. 68, pp. 8-9, ¶ 34). The

---

[8] Plaintiff incorrectly numbered his Response to Corrections Defendants' SMF ¶ 29 as ¶ 30.  (Doc. 74, ¶ 30).

Corrections Defendants maintain that inmates were directed at their orientations to wear protective gear while using hazardous chemicals. (*Id.*).

> In Response, Plaintiff states:
>
> Defendant Davis never insured anything except that inmates signed a piece of paper. The orientation did not consist of anything other than instruction that you are to do as you are told, don't get caught stealing, and no smoking in the kitchen. Nothing was ever discussed regarding safety.
>
> Food Service Instructors never reviewed any safety procedures and inmates signed a form on the date of hiring with no real orientation other than the above instructions.
>
> Additionally, at no time did inmates ever receive training in the use of goggles or gloves or any orientation or instruction in the use of safety equipment when handling any chemicals.

(Doc. 74, p. 10, ¶ 34).

The Corrections Defendants again submit that a number of protective goggles and gloves were stored in the kitchen at all times and that all kitchen workers were able to access this gear. (Doc. 68, p. 9, ¶ 35). The Corrections Defendants further claim that it was mandatory for those workers "on the cleaning detail" to wear goggles and gloves. (Doc. 68, p. 9, ¶ 35).[9]

The Corrections Defendants assert that every three (3) years, DOC institutions must be "inspected by an independent accreditation entity called the American Correctional Association ('ACA')." (*Id.* at ¶ 36). When the ACA audited SCI-Dallas in August of 2008 and August of 2011, the Food Service Department passed and was found to be in accordance with the requisite safety

---

[9] Plaintiff affirms that safety goggles and gloves were available to "Staff" but denies their availability to inmates. (Doc. 74, p. 10, ¶ 35). Plaintiff further states that the cleaning detail "NEVER" wore "ANY safety equipment," as they were never informed of its necessity. (*Id.*).

and sanitation regulations both years. (*Id.*).[10]

During the relevant times, there were between fifteen (15) and nineteen (19) cooks on the morning shift, including Plaintiff. (*Id.* at ¶ 37). The Corrections Defendants assert that these cooks utilized disposable gloves while handling food. (*Id.*). Plaintiff incorrectly numbered his Response to Corrections Defendants' SMF ¶ 37 as ¶ 38 and stated that he has no knowledge with respect to Defendants' SMF ¶ 37. (Doc. 74, ¶ 38).

Although Defendant Davis was not working on the morning of July 25, 2010, Defendant Casey did report the incident to him. (Doc. 68, pp. 9-10, ¶ 38). Defendant Davis saw Plaintiff later that day and observed that he did not appear to have a problem with his eye. (*Id.*).[11]

The Corrections Defendants assert that the chemical at issue is a sanitizer used to clean pots and pans, not a "caustic agent." (Doc. 68, p. 10, ¶ 39). Defendant Davis is not aware of another inmate being similarly injured in the kitchen, and he does not find the chemical at issue to risk serious harm to Plaintiff or any other kitchen worker. (*Id.* at ¶ 40). Defendant Davis notes that Plaintiff had access to safety goggles in July 25, 2010, but that he does not believe that Plaintiff was wearing any. (*Id.*). Finally, Defendant Davis maintains that he never asked inmates to falsify documentation regarding their training. (*Id.* at ¶ 41).

---

[10] Plaintiff offers that while he is unaware of any such accreditation, "any time there was a scheduled tour of the kitchen all new utensils were pulled out, menus were changed, and things were run completely different from the norm of the facility." (Doc. 74, pp. 10-11, ¶ 37). Plaintiff incorrectly numbered his Response to Corrections Defendants' SMF ¶ 36 as ¶ 37. (Doc. 74, ¶ 37).

[11] Plaintiff denies that he was not having problems with his eye when Defendant Davis saw him. (Doc. 74, p. 11, ¶ 39). Plaintiff incorrectly numbered his Response to Corrections Defendants' SMF ¶ 38 as ¶ 39. (Doc. 74, ¶ 39).

Contrarily, Plaintiff maintains that he does not know the name of the chemical at issue and what it is used for, and that goggles were not available to him. Plaintiff also states that Defendant Davis is still asking inmates to falsify documentation regarding their training for work in the kitchen. (Doc. 74, p. 12, ¶'s 40- 41).   Plaintiff's Response at ¶ 40 addresses  Corrections Defendants' SMF ¶'s 39 & 40.  (Doc. 74, ¶ 40).

The Corrections Defendants allege that Defendant Jones, currently employed as a Food Service Manager 2 at SCI-Dallas, held the position of Acting Food Service Manager 2 from January of 2011 until June of 2011. (Doc. 68, pp. 10-11, ¶ 42). Prior to January of 2011, Defendant Jones worked as a Food Service Manager 1 at SCI-Dallas. (*Id.*). Defendant Jones has worked for the DOC since October of 1989. (*Id.*).

While employed as a Food Service Manager 1, Defendant Jones was responsible for supervising both the Food Service Supervisors and the Food Service Instructors and for overseeing the whole operation of SCI-Dallas's Food Service Department. (Doc. 68, p. 11, ¶ 43). Defendant Jones's duties included creating the work schedules and ordering the necessary food and supplies. (*Id.*). While working in this capacity, Defendant Jones's immediate supervisor with Defendant Davis, then the Food Service Manager 2. (*Id.*).

Defendant Jones reiterates that he was charged with providing inmate-workers with an initial job orientation, that included instruction on safety and sanitation standards, and that inmates are required to sign a form at the end of orientation verifying that they completed it. (*Id.* at ¶ 44).[12]

---

[12] Plaintiff asserts that "[i]nmates are instructed to sign a form they aren't even allowed to really read and none of it regards safety training." (Doc. 74, p. 12, ¶ 44).  Plaintiff does not explain how he knows the forms did not regard safety training if he was not allowed to read it.

Defendant Jones also confirms that protective wear, including goggles, was always available for inmate use while working in the kitchen, particularly by those on the cleaning detail. (*Id*. at ¶ 45). Plaintiff states that inmates could not ask for safety equipment and that they did not know what equipment they would need for the chemicals. Plaintiff denies that inmates used goggles while working on the cleaning detail. (Doc. 74, ¶ 45).

Defendant Jones further asserts that various cleaning chemicals are kept in a locked storage room of the Food Service Department at SCI-Dallas. (Doc. 68 at ¶46). Additionally, Defendant Jones claims that the supervisors never give undiluted cleaning chemicals to the inmate-workers. (*Id*.). Plaintiff expressly denies this assertion, stating that "inmates are given a bucket of pure chemical straight out of a large container, and are then instructed to add water by the supervisor." (Doc. 74, p. 13, ¶ 47). Plaintiff incorrectly numbered his Response to Corrections Defendants' SMF ¶ 46 as his first ¶ 47. Plaintiff's Response had two ¶'s 47.

Defendant Jones asserts that he is acquainted with Plaintiff and that Plaintiff still works in the kitchen at SCI-Dallas. Defendant Jones indicates that Plaintiff is able to speak and understand English. (Doc. 68, p. 12, ¶ 47). Plaintiff denies Defendants' SMF ¶ 47 in its entirety but he does not cite to any evidence as support. On Sunday, July 25, 2010, Defendant Jones was not working, as he generally did not work on the weekends. (*Id*. at ¶ 48). Defendant Jones became aware of Plaintiff's chemical splash "some time later." (*Id*.). Defendant Jones states that at the time of the incident, Plaintiff was working as an "a.m. cook" and that during this morning shift, there are generally six (6) Food Service Instructors and at least one (1) Food Service Supervisor working. (*Id*.). On the morning of July 25, 2010, Defendant Casey was working as a Food Service Instructor (*Id*.).

Plaintiff admitted Defendants' SMF ¶ 48 to the extent he had knowledge of it.

Based on documents concerning the incident, including Defendant Casey's filed Employee Incident Report, Defendant Jones finds that the appropriate policy and procedures were adhered to on July 25, 2010, and that the cleaning chemical at issue was diluted and "posed minimal risk to [Plaintiff]." (*Id.* at ¶ 49).[13]

Defendant Jones does not have knowledge of a similar incident ever occurring in the kitchen at SCI-Dallas. (*Id.* at ¶ 50). Defendant Jones further states that he never asked nor is he aware of any other individual employed by SCI-Dallas who asked any inmates to falsify any documentation regarding their training and/or orientation. (Doc. 68, p. 13, ¶ 51). Plaintiff essentially denies both ¶'s 50 & 51.

The Corrections Defendants submit that Defendant Leskowky, currently working as a Registered Nurse Supervisor ("RNS") at SCI-Dallas, has been employed in that capacity since 1993. (*Id.* at ¶ 52). Between 1987 and 1993, Defendant Leskowsky worked as a Registered Nurse ("RN"). (*Id.*). Plaintiff admits this SMF.

As RNS, Defendant Leskowsky was responsible for supervising fourteen (14) RNs and fourteen (14) Licensed Practical Nurses ("LPNs"). (*Id.* at ¶ 53). These supervised nurses "administer care within their scope-of-practice (licensure) and job description." (*Id.*). While Defendant Leskowsky does not generally give "routine nursing care" to inmates, when SCI-Dallas experiences

---

[13] Plaintiff denies that the provided chemical was diluted with water. Plaintiff states that he had to dilute the chemical himself and that the measuring dispenser was not provided to him. (Doc. 74, pp. 13-14, ¶ 49). In any event, it is not disputed that the chemical in question was diluted on July 25, 2010.

a medical emergency, Defendant Leskowsky assists the nurse on duty to guarantee "safe care delivery." (*Id.*). The Corrections Defendants assert that Defendant Leskowsky's immediate supervisor is the "Corrections Health Care Administrator ('CHCA')." (*Id.*). Plaintiff simply denies Defendants' SMF ¶ 53 without any explanation or cite to the record.

According to the Corrections Defendants, Defendant Leskowsky has studied Plaintiff's medical records, finding that Plaintiff has a medical history of pterygium growths in his eye. (Doc. 68, pp. 13-14, ¶ 54). Defendant Leskowsky observes that Plaintiff began suffering these vision problems years before the chemical incident on July 25, 2010, as he was diagnosed with "bilateral Pterygium" on June 24, 2003. (*Id.*). Regarding the medical details of a pterygium, Defendant Leskowky notes:

> Pterygium is an abnormal tissue growth of tissue arising from the sclera of the inner corner of the eye that has the potential to obstruct the patient's vision by growing over the pupil portion of the eye. The decision to surgically remove a Pterygium is made by the physician/eye doctor generally based on size and location of the Pterygium and if vision is directly affected. Excision of the Pterygium is a non-emergent procedure generally done by an ophthalmologist. Pterygium has a high incidence of reoccurrence/re-growth after excision.

(*Id.*). Plaintiff admits Defendants' SMF ¶ 54.

Defendant Leskowsky asserts that on May 1, 2006, Plaintiff presented to SCI-Dallas medical staff complaining of problems with his right eye, after which he was diagnosed with "Pterygium medially." (Doc. 68, p. 14, ¶ 55). Medical staff saw Plaintiff again on January 4, 2008, when he claimed that he was struck in the left eye with some shoe repair glue. (*Id.*). Staff members flushed Plaintiff's left eye with water, and the treating physician wrote "in the Progress Note that upon exam he noted a 'small Pterygium' in the right eye," although that was not related to the injury from

the shoe repair glue. (*Id*.). Plaintiff admits Defendants' SMF ¶ 55.

The Corrections Defendants state that on December 24, 2008, Plaintiff complained to medical staff members that he felt as if there was a "boulder" in his eye. (Doc. 68, pp. 14-15, ¶ 56). Plaintiff was diagnosed with conjunctivitis on December 25, 2008. (*Id*.).

On April 12, 2009, Plaintiff again presented to medical staff complaining of redness and swelling in his right eye, which had allegedly been bothering him for a couple of days. (*Id*.). Staff members diagnosed Plaintiff with "right eye irritation." (*Id*.). Plaintiff admits Defendants' SMF ¶ 56.

The Corrections Defendants state that on November 12, 2009, Defendant Dr. Bohinski examined Plaintiff "during a scheduled clinic." (Doc. 68, pp. 15-16, ¶ 57). When Plaintiff inquired about his eye, Defendant Dr. Bohinski reviewed Plaintiff's medical records and subsequently noted: "I will process for excision of Pterygium." (*Id*.). On December 17, 2009, a local ophthalmologist examined Plaintiff and recommended an excision of Plaintiff's right eye pterygium, which was scheduled for July 14, 2010. (*Id*.). After a scheduling issue on the part of the ophthalmologist, the procedure was rescheduled for July 22, 2010. (*Id*.). On July 22, 2010, SCI-Dallas experienced an "Institutional Emergency," which resulted in a prison lock-down and precluded the Plaintiff's eye surgery from occurring. (*Id*.). Because removing a pterygium is a non-emergent procedure, Plaintiff's excision was rescheduled for and performed on August 20, 2010. (*Id*.).

In his Response to Defendants' ¶ 57, Plaintiff admits and denies it in part, and submits:

> The plaintiff expressed repeatedly at these visits that he should be given some type of protective gear because they weren't giving it to him at work and he had already gotten something in his eyes once already at the shoe shop. Dr. Bohinski refused to issue such and the plaintiff then asked to have his job changed because he did not feel safe working with the chance of the chemicals getting in his eyes. This request was denied.

The Plaintiff denies that the alleged reasons for the delays in treatment existed or were the basis for why he never got the appropriate and timely treatment.

(Doc. 74, pp. 14-15, ¶ 57).

The Corrections Defendants, via Defendant Leskowsky, assert the following with respect to Plaintiff's chemical eye splashing incident on July 25, 2010:

> According to the Progress Notes, on July 25, 2010 at 1100 hours, inmate Robles ambulated to the infirmary with the kitchen steward. The kitchen steward explained to the Nurse on duty that inmate Robles got a cleaning agent in his right eye. Upon examination by the nurse, Inmate Robles claimed that his right eye was painful and that his vision was blurry. Robles' eye (was examined) and immediately flushed and a moist sterile dressing was applied by the Registered Nurses who was working in the infirmary. After the care intervention by Registered Nurse, inmate Robles was soon after taken to the Wilkes-Barre General Hospital emergency room for further examination and follow up care. He was seen in the ER at Wilkes-Barre General Hospital and released. At the ER, his eye was flushed and he was prescribed Tobradex ointment for his eye at bedtime. He was diagnosed with an eye irritation.

(Doc. 68, p. 16, ¶ 58).[14]

On July 26, 2010, medical staff members at SCI-Dallas again examined Plaintiff at approximately 8:40 am. (*Id.* at ¶ 59). Plaintiff "was assessed in part as 'status post chemical irritation'" and was directed to continue applying his prescribed eye drops. (*Id.*). Plaintiff admits Defendants' SMF ¶ 59.

On July 27, 2010, Plaintiff presented to medical staff complaining of irritation in his right eye

---

[14] Plaintiff affirms this SMF with a clarification:

> The plaintiff received all listed treatment as stated with the exception that he was removed from the hospital before seeing the Doctor who he was told would be coming down to examine him. This was per order of Defendant Leskowski (sic) and Bohinski. This delayed his treatment and caused undue suffering.

(Doc. 74, p. 15, ¶ 58).

for which he was given an eye patch to use as necessary. (Doc. 68, pp. 16-17, ¶ 60). On August 20, 2010, Dr. Roth, an ophthalmologist of Kingston, PA, successfully completed an excision of Plaintiff's right eye pterygium. (*Id.*). Plaintiff admits Defendants' SMF ¶ 60.

The Corrections Defendants submit that Defendant Leskowsky had never treated, nor had he ever even spoken to, Plaintiff, but Safety Manager Eric Sowga, the investigator assigned to Plaintiff's grievance, and SCI-Dallas's grievance coordinator interviewed Defendant Leskowsky regarding the incident on July 25, 2010. (Doc. 68, pp. 17-18, ¶ 61). At Mr. Sowga's request, Defendant Leskowsky provided information obtained from Plaintiff's medical records, including Dr. Roth's observation that Plaintiff displayed "no chemical burns or any other issues with his eyes related to the incident." (*Id.*). Plaintiff admits Defendants' SMF ¶ 61.

The Corrections Defendants assert that Plaintiff has no support for his claim that he was given inadequate or delayed treatment for his eye irritation on July 25, 2010, as he was immediately taken to an emergency room and subsequently provided with follow-up care, which is documented in Plaintiff's medical records. (Doc. 68, p. 18, ¶ 62).[15] The Corrections Defendants additionally submit that Plaintiff's claim of falsification of his medical records is without merit. (*Id.*).[16]

---

[15] The Corrections Defendants note that the Medical Department at SCI-Dallas employs a certified Registered Health Information Technician ("RHIT") who guarantees proper maintenance of the facility's medical records. (Doc. 68, p. 18, ¶ 62).

[16] In Doc. 74 Response, Plaintiff denies paragraph 62 of the Corrections Defendants' Statement of Facts and submits:

> The plaintiff's treatment for the covering over his eyes was delayed because of monetary reasons as told to him by Defendant Bohinski. The plaintiff walked around with obscured vision for months because it was a non-emergent condition.
> This obstruction of his vision left him in constant pain and discomfort and

The Corrections Defendants state that Leilani Sears is currently employed as an Administrative Officer 2 by the DOC, a position that she has maintained since July of 2007, although she has worked for the DOC since March of 2000. (*Id.* at ¶ 63). In her capacity as an Administrative Officer 2, Mrs. Sears works as a Grievance Review Officer in the Secretary's Office of Inmate Grievances, where she collects and processes inmates' appeals from their grievances "pursuant to Department policy DC-ADM 804, entitled 'Inmate Grievance System,'" a policy with which Mrs. Sears is familiar. (Doc. 68, p. 19, ¶ 64).

According to Department policy DC-ADM 804, the Grievance Coordinator at the institution where the underlying events occurred processes inmate grievances. (*Id.* at ¶ 65). The Corrections Defendants assert:

> There are three levels of appeal available to the inmate. If the inmate is dissatisfied with the response to his inmate grievance, he can appeal the matter to the Facility Manager or Superintendent. He has 15 working days in which to do so. In turn, if the inmate is dissatisfied with the Superintendent's decision upon appeal, the inmate may appeal that decision to final review by the Secretary's Office of Inmate Grievances and Appeals.

(*Id.*).

---

also with a loss of depth perception to participate in some of life's leisure activities that he would have otherwise had the opportunity to participate in if he were given prompt and appropriate treatment that ways not based on monetary concerns of the facility.

This altered his life condition precipitously and along with that he also suffered further injury to his eye for which each defendant had a direct part in the resultant liability thereof.

Additionally, there is no proof of the rescheduling claims mentioned in any of the records.

(Doc. 74, pp. 15-16, ¶ 62).

The Corrections Defendants requested that Mrs. Sears review the Office of Inmate Grievances's records for any grievance appeals filed by Plaintiff between July 25, 2010 through December 31, 2010, the time period within which Plaintiff was incarcerated at SCI-Dallas. (*Id.* at ¶ 66). From this review of the grievance records, the Corrections Defendants find that between July 25 and December 31, 2010, Plaintiff appealed only one (1) grievance to final review, Grievance No. 328961, dated August 1, 2010. (Doc. 68, p. 20, ¶ 67). The stated grievance concerned the July 25, 2010, incident. (*Id.*).

Plaintiff admits Defendants' SMF ¶'s 63-67.   (Doc. 74).

As stated, many of Plaintiff's denial of Corrections Defendants's SMF do not cite to the evidence as required.  It is well-settled that "a mere denial is insufficient to raise a disputed issue of fact, ... , and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969)(citations omitted).

**V. DISCUSSION.**

In their detailed Brief in Support of their Motion for Summary Judgment (Doc. 67), the Corrections Defendants initially submit the remaining claims against them are: "an Eighth Amendment state-created danger claim against Corrections Defendant Casey"; "Eighth Amendment claims against Corrections Defendants Davis and Jones"; "and an Eighth Amendment medical claim against Corrections Defendant Leskowsky." (Doc. 67, p. 6 (citing Doc. 23)). The Corrections Defendants argue: (1) that they are entitled to summary judgment in their favor because Plaintiff failed to properly exhaust the administrative remedies available to him as to all of the Defendants; (2) that Defendant Casey is entitled to summary judgment in his favor because a reasonable jury

would not be able to find that there existed a state-created danger by the disinfectant used to clean the kitchen; (3) that Defendants Davis and Jones are entitled to summary judgment in their favor because a reasonable jury would not be able to find that they acted with deliberate indifference to any serious harm risked by the cleaning disinfectant to Plaintiff; and, (4) that Defendant Leskowsky is entitled to summary judgment in his favor because a reasonable jury would not be able to find that he acted with deliberate indifference to any serious medical needs of Plaintiff, where Plaintiff's irritation of his eye was treated promptly, and he was subsequently taken to a local emergency room. (Doc. 67, pp. 6-7).

### 1. Exhaustion of Administrative Remedies

With respect to the Corrections Defendants' first argument, that they are entitled to summary judgment in their favor due to Plaintiff's failure to fully exhaust his available DOC administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), the Corrections Defendants submit that Plaintiff only appealed a single grievance regarding the underlying incident to final review, Grievance No. 328961. (*Id.* at pp. 7-8). The Corrections Defendants assert that Grievance No. 328961 fails to identify all of the Corrections Defendants or to mention Plaintiff's claims of faulty medical care and prison record falsification. (*Id.* at p. 8). *(See also* Doc. 69, p. 60).

The Corrections Defendants state that according to the PLRA, it is mandatory that a prisoner exhaust all administrative remedies available to him prior to filing a suit in federal court. (*Id.* at p.

9, citing 42 U.S.C. § 1997e(a)).[17] Defendants submit that the United States Supreme Court has declined to accept any exceptions to this statutory requirement, including futility, and, accordingly, federal district courts lack discretion regarding the exhaustion requirement. (Doc. 67, pp. 9-10).[18]

As support, the Corrections Defendants assert:

The U.S. Supreme Court has rejected the Sixth Circuit's requirement that an inmate could only sue those defendants identified in his inmate grievance, because the state's grievance policy did not contain such a requirement. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Because the PLRA does not contain any such requirement, it held that the prison's grievance system determined the level of detail required in inmate grievances for purposes of exhaustion. *Id. See also Spruill v. Gillis*, 372 F.3d 218, 226 (3d Cir. 2004) (failure to exhaust under the PLRA constitutes a procedural default under the PLRA; the PLRA does not require "simple exhaustion" but rather "proper exhaustion"; plaintiff inmate's failure to identify a medical defendant constituted procedural default).

(*Id.* at p. 10).[19]

---

[17] 42 U.S.C. § 1997e(a) provides:

**(a) Applicability of administrative remedies**
No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

[18] Defendants cite to "*Booth v. Churner*, 532 U.S. 731, 739 (2001) (exhaustion requirement under the PLRA applies despite the lack of relief for money damages under prison grievances); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (exhaustion requirement applied to excessive use of force claim)."

[19] In his Brief in Opposition, Plaintiff argues that *Jones* is more beneficial to his argument than to that of the Corrections Defendants and he states: "Even the defendants acting through their own brief have confirmed that the U.S. Supreme court (sic) has rejected the 6th Circuit's requirement that a Plaintiff could only sue those defendants identified in his inmate grievance, because the policy doesn't contain such a requirement." (Doc. 75, p. 5).
    In their Reply Brief, the Corrections Defendants submit that *Jones* does not overrule *Spruill* and that the *Jones* Court only rejected the stated requirement of the Sixth Circuit that the inmate could only sue Defendants identified in his grievance  because the applicable grievance

The Corrections Defendants contend that in the instant case, Plaintiff filed only one grievance arising from the incident on July 25, 2010, to final review, Grievance No. 328961, dated August 1, 2010, prior to initiating this suit. (*Id. See* Doc. 69, p. 60). Although this grievance was appealed to final review, it did not identify all of the remaining Corrections Defendants, as "[n]one of the Corrections Defendants are named in the grievance and the only Corrections Defendants mentioned in the institutional response to the grievance are FSI Casey and RNS Leskowsky." (*Id.*). The Corrections Defendants argue that because Plaintiff neglected to name all of the Corrections Defendants in his grievance, he did not properly exhaust his administrative remedies under the cases of *Jones* and *Spruill*, and, thus, Defendants contend that Davis and Jones are entitled to summary judgment in their favor. (*Id.* at pp. 10-11).

The Corrections Defendants further assert that Plaintiff did not properly exhaust as to all of his claims because the stated grievance does not make mention of record falsification or inadequate medical care. (*Id.* at p. 11).[20]   The record shows that Plaintiff's Grievance No. 328961 specifically claimed that unnamed prison kitchen staff failed to issue him protective eye wear or gloves on July

---

policy contained no such requirement. (Doc. 78, p. 4). Pennsylvania's inmate grievance system, however, does mandate that inmates name all relevant persons. (*Id.*).

[20] While we similarly find no mention of these stated claims in Plaintiff's <u>initial grievance</u>, we note that Plaintiff does address them in his subsequent appeals, and, accordingly, prison officials were on notice of potential claims arising from these allegations. (Doc. 69, pp. 60-68). We also point out that Plaintiff filed his initial grievance on August 1, 2010, just five (5) days after the kitchen incident, and, as such, any subsequent events arising from that incident, about which he now complains, may not have occurred at the time of his initial grievance filing. (*Id.*). Thus, we find that it was not practicable for Plaintiff to name all of Corrections Defendants and to state all of his claims when he filed  Grievance No. 328961, and we will not recommend that the Court grant Defendants Casey and Leskowsky summary judgment based on this specific argument.

25, 2010, when he was directed to use a chemical detergent and clean up grease. Plaintiff claimed that the chemical slashed into his eye and that he sustained injuries to his eye "due to negligence on the part of staff to follow safety protocols when handling chemicals ... ." (Doc. 69, p. 60). In his Brief in Opposition to the Corrections Defendants' Motion for Summary Judgment, Plaintiff argues that he has fully exhausted all available administrative remedies with respect to his claims against the remaining Corrections Defendants. (Doc. 75, p. 4).

Initially, Plaintiff notes that because he "does not read, write, or speak English," he enlisted the assistance of other inmates to translate and file his grievance paperwork for him. (*Id.*). According to Plaintiff, SCI-Dallas has never provided any paperwork, including those outlining the grievance and safety procedures, for example, in Spanish, and the facility employs no one to translate for Plaintiff. (*Id.*). Accordingly, while Plaintiff states that he attempted to act in accordance with all grievance procedures, he was effectively precluded from doing so because of SCI-Dallas's "lack of compliance with DOC policy to make all policies and procedures available in English and Spanish." (*Id.*).[21]

Furthermore, Plaintiff asserts that he actually did exhaust available administrative remedies *via* Grievance No. 328961. As support for this contention, Plaintiff states:

> In Espinal v. Goord, 558 F.3d 119, 127 (2d. Cir. 2009), the courts ruled that (dismissal for failure to exhaust administrative remedies when prisoner did not identify all defendants was improper when 'the pro se prisoner cannot be expected to infer the existence of an identification requirement in the absence of a procedural

---

[21] In their Reply Brief, the Corrections Defendants dispute this assertion, stating that the DOC "issues a version of the Inmate Handbook in Spanish" and that "Plaintiff cannot credibly allege ignorance of the inmate grievance system at SCI-Dallas, especially since he used it on more than one occasion while there." (Doc. 78, p. 4).

rule"). See also: Williams v. Beard, 482 F.3d 637, 639-640 (3d Cir. 2007) (dismissal for failure to exhaust administrative remedies improper when inmate did not name specific defendant in administrative grievance and this procedural default was excused.")

(Doc. 75, p. 4).

Plaintiff submits that no grievance policy requires an inmate to identify every individual that he or she may ultimately name in a subsequent civil action and that the Corrections Defendants have put forth no evidence of such a mandate. (*Id.* at p. 5).

In their Reply Brief, the Corrections Defendants assert that Department Policy DC-ADM 804, entitled "Inmate Grievance System Policy," reads in relevant part: "The inmate will identify any person(s) who may have information that could be helpful in resolving the grievance." (Doc. 78, p. 4). Defendants further submit that in *Spruill*, the Third Circuit interpreted this policy to mean that an inmate will be in procedural default unless he can adequately explain why he neglected to name a defendant in his grievance. (*Id.,* citing 372 F.3d at 226).

Plaintiff additionally refutes Defendants' contention that he failed to address in his grievance his claims that he received inadequate medical care for his eye and that kitchen staff falsified documents after the July 25, 2010 incident indicating that inmates received the proper safety training, and he states "as in each and ever[y] appeal the plaintiff raised these issues in his complaint expressing the negligence of staff to adequately treat him and in those grievances he clearly shows that staff asked him to falsify documents to cover up the fact that he had never had any training." (Doc. 75, p. 5).

We agree with the Corrections Defendants that Plaintiff has not properly exhausted his available administrative remedies with respect to all moving Defendants and, we will recommend

that Defendants Davis and Jones be granted summary judgment in their favor. We do not find that prison officials were on notice that Plaintiff was implicating Defendants Davis and Jones with respect to his claims regarding the July 25, 2010 incident. *See Spruill*, 372 F.3d at 234.

As correctly stated by the Corrections Defendants, the U.S. Supreme Court held in *Jones* that proper exhaustion of administrative prison remedies requires compliance "'with the applicable procedural rules,' [ ] - rules that are defined not by the PLRA, but by the prison grievance process itself." 549 U.S. at 218 (citation omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). The Court found that although the requirement for grievance detail will vary among different prison systems, it is these individual requirements that delineate what constitutes proper exhaustion. 549 U.S. at 218. Accordingly, we turn to the grievance procedure in place for inmates of the Pennsylvania DOC. *See Gravley v. Tretinik*, 414 F. App'x 391, 393-94 (3d Cir. 2011); *Spruill*, 372 F.3d at 231-32; *Bibbs v. Klem*, Civil No. 3:CV-08-2279, 2011 WL 838908, at *3 (M.D. Pa. Mar. 4, 2011); *Miller v. Schuylkill Cnty. Prison*, Civil No. 1:CV-07-0331, 2007 WL 3342766, at *4 (M.D. Pa. Nov. 9, 2007).

The Third Circuit has found three reviewing stages within the Pennsylvania DOC's grievance system: "Initial Review (DC-ADM-804 Part VI.B), which addresses the inmate's filed grievance; the first appeal from the Initial Review, known as Appeal to Facility Manager (DC-ADM-804 Part VI.C); and a second and final appeal, the Appeal to Secretary's Office of Inmate Grievances and Appeals (DC-ADM-804 Part VI.D)." *Spruill*, 372 F.3d at 232. *See also Bibbs*, 2011 WL 838908, at *4. Plaintiff's grievance regarding the underlying July 25, 2010 incident in the instant case was fully appealed in accordance with the DOC administrative remedy process. (Doc. 69, pp. 60-68). In so

finding, we must now determine whether the assertion that Plaintiff neglected to identify all of the Corrections Defendants and to mention each of his claims raised herein implicates a procedural default of his grievance. *Spruill*, 372 F.3d at 232; *see also Bibbs*, 2011 WL 838908, at *4.

In *Spruill*, the Third Circuit held that the text of the Pennsylvania's DOC policy concerning identifying specific individuals "is mandatory, or nearly so: 'The inmate shall include a statement of the facts relevant to the claim.... The inmate should identify any persons who may have information that could be helpful in resolving the grievance.'" 372 F.3d at 234 (quoting DC-ADM 804, Part VI.A.1.d.). The court found that while, ordinarily, an inmate's failure to name a key individual would result in procedural default for any potential claims against that individual, such a default may be excused when the responding grievance officer actually identifies the individual at issue in his or her "Initial Review Response." 372 F.3d at 234.[22] Although we acknowledge in the instant action that Plaintiff did not specifically name any individuals in his initial grievance, we find that Mr. Sowga's mention of Defendants Casey and Leskowsky in his "Initial Review Response" dated August 24, 2010, excuses any procedural default with respect to Plaintiff's current claims against those two Defendants. (Doc. 69, pp. 60-61). *See Robinson v. Johnson*, 343 Fed. Appx. 778 (3d Cir. 2009); *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007).

We additionally find, however, that because neither Plaintiff's grievance, nor the subsequent responses and appeals, make mention of Defendants Davis and Jones, Plaintiff's current claims as

---

[22] The court indicated that because the goal of the identification requirement is to put prison officials on notice, that purpose is achieved when the prison officials themselves acknowledge that a certain unidentified individual is "fairly within the compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234.

against these two Corrections Defendants are procedurally defaulted. *See Spruill*, 372 F.3d at 234; *McClain v. Kale*, Civil No. 1:10-CV-00035, 2012 WL 2192242, at *3 (M.D. Pa. Apr. 23, 2012) (finding that the plaintiff-inmate procedurally defaulted his claim against a certain corrections officer because he did not identify the officer in his prison grievance and because there was no basis on which the reviewing grievance coordinator would have realized that the officer was involved in the underlying events). *Cf. Victor v. SCI Smithfield*, Civil No. 3:08-cv-1374, 2011 WL 3584781, at *8 (M.D. Pa. Aug. 12, 2011) (permitting the plaintiff-inmate's claims as against certain prison officials to proceed when the inmate explained why he could not practicably identify them in his grievance).

We do not find that the officials at SCI-Dallas would have been on notice of Plaintiff's potential claims against Defendants Davis and Jones regarding the July 25, 2010 incident, and, as such, we will recommend that these two Corrections Defendants be granted summary judgment with respect to any remaining constitutional claims Plaintiff has against them as a result of Plaintiff's failure to exhaust his available administrative remedies. *See Spruill*, 372 F.3d at 234. As stated, we will not recommend that Corrections Defendants be granted summary judgment with respect to Plaintiff's remaining claims against Defendants Casey and Leskowsky for failure to exhaust his available administrative remedies.

*2. Defendant Casey — State-Created Danger Claim*

The Corrections Defendants' second argument avers that Defendant Casey is entitled to summary judgment in his favor because a reasonable jury would be unable to find state-created danger with respect to the chemical disinfectant at issue. (Doc. 67, p. 11).

33

Defendants state that this Court has allowed Plaintiff's claim against Defendant Casey to proceed under the state-created danger theory; however, Plaintiff cannot establish all four (4) necessary elements of such a claim because he will not be able to prove that Defendant Casey "acted 'with a degree of culpability that shocks the conscience.'" (*Id.*). While state-created danger has been found in certain scenarios, including one where police officers permitted an intoxicated individual to walk home at night, which later resulted in injury, Defendants state that "[t]he facts in this case do not resemble those scenarios." (*Id.* at pp. 11-12).

With respect to the state-created danger doctrine, the Corrections Defendants submit:

The Third Circuit has set forth the following elements for a valid state-created danger claim under the Due Process Clause:

"(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."

*Kaucher v. County of Bucks*, 455 F.3d 418, 431 (3d Cir. 2006), *citing Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006), *cert. denied*, 549 U.S. 1264 (2007).

(Doc. 67, p. 12). *See also Walter v. Pike County*, 544 F.3d 182, 191-92 (3d Cir. 2008).

According to the Corrections Defendants, *Kaucher* involved a prison guard and his wife who each contracted methicillin-resistant Staphylococcus aureus ("MRSA") and brought suit against

officials of the county prison, claiming that they were deliberately indifferent. (*Id.*). While the evidence demonstrated that a MRSA outbreak had occurred at the prison and that officials responded by isolating those infected and re-teaching sanitation policies, the Third Circuit did not find that the officials were aware of the inadequacy of their actions at the time of the outbreak. (*Id.* at pp. 12-13).[23]

Regarding the "foreseeable harm element" of a state-created danger claim, the Corrections Defendants compare the instant case to *Kaucher*, and state that Plaintiff Robles similarly lodges his argument in Defendant Casey's alleged failures in properly training him and providing him with safety gear, but he does not submit any "affirmative acts which directly caused the harm." (Doc. 67, p. 13). Corrections Defendants state that while Plaintiff alleges Defendant Casey did not instruct him on how to use the disinfectant to clean the kitchen and did not give him protective gear, Plaintiff cannot prove that Casey caused the disinfectant to splash into Plaintiff's eye. (*Id.*).

The Corrections Defendants further assert that Plaintiff has not put forth any evidence demonstrating that Defendant Casey "misrepresented any danger posed by cleaning the tables"

---

[23] Defendants cite the following from *Kaucher*, 455 F.3d at 433:

"The Kauchers have not alleged affirmative acts that were the 'but for cause' of the risks they faced. They frame their claim in terms of actions affirmatively creating dangerous conditions and affirmatively misrepresenting dangers. But at base, both aspects of their claim allege failures to take actions sufficient to prevent the Kauchers' infections. In the first instance, they contend defendants failed to act affirmatively to improve conditions at the jail. In the second instance, they contend defendants failed to act affirmatively to educate and warn inmates and corrections officers about MRSA and to train them in infection prevention."

(Doc. 67, p. 13).

with the chemical. (*Id.*). Rather, Defendants state that the evidence indicates that Plaintiff underwent orientation, which included a review of safety and sanitation procedures, prior to beginning his job in the kitchen and that had worked with the prison food services since 2005. (*Id.* at pp. 13-14 & Doc. 69, p. 68). Thus, as Defendants note, Plaintiff had worked in the prison kitchen for several years before the July 25, 2010 incident and was familiar with the cleaning processes. (*Id.* at p. 14).[24]

In his Brief in Opposition, Plaintiff asserts that his harm was foreseeable and direct because the Corrections Defendants had knowledge of the risks posed by the cleaning chemicals and failed to ensure that the appropriate safety procedures were known and followed by the inmates. (Doc. 75, p. 6).

With respect to the "shocks the conscience element" of a state-created danger claim, the Corrections Defendants submit that Defendant Casey "did not act 'with a degree of culpability that shocks the conscience.'" (Doc. 67, p. 14). Because Defendant Casey had no knowledge of any incident where an inmate-worker was injured by a cleaning chemical while working in the kitchen, he did not find any risk of harm posed by the disinfectant to Plaintiff or any other individual. (*Id.*). Defendants further note that "[i]t is obvious that you should not get the disinfectant in your eyes" and that if such an event does occur, the affected individual should immediately flush his or her eyes with water and go to an emergency room. (*Id.*). The undisputed evidence shows that the July 25, 2010 incident with Plaintiff was the first incident of which Defendant Casey was aware where

---

[24] The Corrections Defendants also note that the disinfectant at issue was not caustic and was diluted, and resulted only in an irritation to Plaintiff's eye. (Doc. 67, p. 14 & Doc. 69, pp. 84, 87-88, pp. 119-120, 133-134).

a kitchen inmate worker complained about being injured by a chemical in the kitchen. (Doc. 69, p. 84).

The Corrections Defendants find the facts and claims of the instant case to be analogous to those of *Brickell v. Clinton County Prison Bd.*, 658 F. Supp. 2d 621, 628 (M.D. Pa. 2009), in which a prison inmate was burned by hot grease while working in the facility's kitchen. (Doc. 67 at p. 15). Defendants quote the following from the *Brickell* Court's decision:

> "In her claim based on state-created danger, Brickell has failed to adequately allege conduct by the defendants that shocks the conscience. Instead, Brickell's allegations under count II really allege that [certain defendants] were negligent in their training of [other defendants]. In addition, Brickell has failed to allege any set of facts that point to [certain defendants] engaging in behavior that would shock the conscience in regards to setting up procedures and policies to protect inmates working in the CCCF kitchen. In fact, in her complaint, Brickell has even used language evidencing a recognition that defendants were simply negligent."

(*Id.*, citing 658 F. Supp. 2d at 629).

The Corrections Defendants argue that, similar to the plaintiff in *Brickell*, Plaintiff in the instant case has not alleged conscience-shocking conduct on the part of any Defendant; rather, Plaintiff "merely contends that the Corrections Defendants were negligent in failing to properly train him concerning how to handle cleaning agents in the kitchen." (Doc. 67, p. 15). Defendants maintain, however, that negligence by itself cannot create a constitutional violation. (*Id.* at pp. 15-16 , citing *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Daniels v. Williams*, 474 U.S. 327, 333 (1986)). Corrections Defendants are correct in that under the state created danger doctrine, it is not sufficient to establish a claim if the state actor's conduct amounted to negligence. *Kaucher*, 455 F.3d at 435-36.

The Corrections Defendants further argue that even if Plaintiff lacked training on "how to handle a mild disinfectant" or was not supplied with protective goggles to wear while cleaning, such failures may amount to negligence, but they do not constitute state-created danger. (Doc. 67, p. 16).

Corrections Defendants stress that this action is now at the summary judgment phase of litigation, and they correctly state that Plaintiff cannot rely only on his Complaint's allegations but must produce evidence proving all of the elements of his claim against Defendant Casey. (*Id.*). The Corrections Defendants find that their evidence demonstrates that Plaintiff's allegations of inadequate safety training, safety gear and maintenance are without merit, as Plaintiff underwent safety training in orientation, had safety gear available to him and had experience with kitchen cleaning prior to July 25, 2010. (*Id.*).

In his Brief in Opposition, Plaintiff states that he intends to establish at trial, *via* witnesses, that Defendant Casey "acted with a degree of culpability that shocks the conscience." (Doc. 75, p. 5). Plaintiff further contends that, even absent witness testimony, Defendant Casey's statements thus far already indicate that he engaged in conscience-shocking conduct in that they reflect "his indifferent state of mind." (*Id.*). Plaintiff stresses that while Defendant Casey asserts that he was unaware of any serious risk of harm posed by the cleaning chemicals, he acknowledges in the same statement "that he is aware of the safety protocols that are NECESSARY when using such chemicals." (*Id.*). Plaintiff maintains that a jury may conclude that Defendant Casey did in fact know of the safety protocols surrounding the cleaning chemicals and ignored them in issuing the chemicals to inmates, which would establish his liability under the Eighth Amendment. (*Id.*).

Plaintiff further submits:

In this case, the disregard for the safety of those in whose care and custody they have been entrusted, mandated that they follow all safety protocols, and to conclude that although there were numerous policies in place mandating the issuance of safety equipment, they concluded that working with said detergents was HARMLESS according to their own statements could most assuredly shock the conscience of any juror.

(*Id.* at p. 6).

In their Reply Brief, the Corrections Defendants reiterate their contention that Plaintiff, in particular, has not demonstrated "that the act of asking an experienced inmate kitchen to combine water and the cleaning agent in a bucket shocked the conscience, especially where the Plaintiff had worked in the kitchen for many years and signed a form acknowledging receipt of safety training." (Doc. 78, p. 7 & Doc. 69, p. 86).

Regarding the "foreseeable victim element" of a state-created danger claim, the Corrections Defendants state that a reasonable jury would not be able to find that Plaintiff was a foreseeable victim under *Bright* and *Kaucher*. (Doc. 67, p. 16). Defendants note that when Defendant Casey instructed Plaintiff to clean the kitchen, Plaintiff had been working in the kitchen for years (*i.e.*, since 2005), thus he was not a novice to this type of cleaning. (*Id.*). The Corrections Defendants further state that Plaintiff's assertions that he is incapable of speaking and understanding the English language are not truthful. (*Id.* at pp. 16-17 & Doc. 69, p. 83). Accordingly, Corrections Defendants state that "[i]t was not foreseeable that [Plaintiff] would somehow splash the disinfectant in his eyes." (*Id.* at p. 17).

In his Brief in Opposition, Plaintiff argues that he was indeed a "foreseeable victim" of the Corrections Defendants' conduct because he is an inmate under the care and custody of the

Pennsylvania DOC "and there officers who are at all times acting under color of state law. (Doc. 75, p. 6).

With respect to the "affirmative act element" of a state-created danger claim, the Corrections Defendants submit that federal courts "have held that 'liability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.'" (Doc. 67, p. 17, quoting *Bright*, 443 F.3d at 282).[25]

Defendants assert that in the instant case, Plaintiff's state-created danger claim against Defendant Casey arises out of Defendant Casey's alleged failures; the state-created danger doctrine, however, necessitates an affirmative act on the part of the state actor. (Doc. 67, p. 17). The Corrections Defendants reiterate that Defendant Casey merely instructed Plaintiff to clean in the kitchen and did not cause the disinfectant to come into contact with Plaintiff's eye. (*Id.*).

The Corrections Defendants find the allegations of the instant Complaint analogous to those of *Cole v. Big Beaver Falls Area Sch. Dist.*, 2009 U.S. Dist. LEXIS 105580, at *15 (W.D. Pa. Nov. 12, 2009):

In *Cole*, the district court granted the school district's motion to dismiss in a Section

---

[25] As support, Defendants submit:

In *Bright*, a convicted child molester shot and killed the younger sister of his victim, while he was on probation. The family sued various probation officials, claiming that they should have revoked the criminal's probation earlier. The Court found that the State did not create a danger which led to substantive due process protection. *See also DeShaney v. Winnebago County Dept of Social Servs.*, 489 U.S. 189, 201 (1989) (no state-created danger created when child placed in custody of natural father, who abused and injured him).

(Doc. 67, p. 17).

1983 claim and rejected the plaintiff's state-created-danger theory of liability. The minor plaintiff's fingers were severed in the industrial materials classroom of a senior high school, where a protective guard had been removed from a saw blade. The district court in *Cole* wrote: "The Amended Complaint does not set forth any facts that relate to the acts or omissions of Defendant School District and how it placed the Plaintiff in a dangerous position that was foreseeable, other than its employment of the Materials Education Instructor." *Id.* at *15-6.

(Doc. 67, p. 18).[26]

Corrections Defendants assert that the underlying facts in the present case are not comparable to those of cases in which courts have found state-created danger:

In *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996), police officers separated a drunken wife from husband and sent her home unescorted in the cold, resulting in her injuries from hypothermia. The Court found that the fourth element was met under those facts. Similarly, in *Estate of Smith v. Marasco (Smith I)*, 318 F.3d 497, 510 (3d Cir. 2003), the Third Circuit held that the use of tear gas and other actions by police unit during a standoff with a Vietnam veteran in his home created a opportunity [sic] for harm to the man. The man apparently died of a heart attack.

(*Id.* at p. 19).

Corrections Defendants find that in the above-cited cases, a dangerous situation resulted from conduct of state actors, which ultimately caused harm to the plaintiffs. (*Id.*). Here, however,

---

[26] The Corrections Defendants additionally cite *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008):

In *Phillips*, a 911 dispatcher who was caught improperly accessing databases to locate his former girlfriend and her new boyfriend, was suspended; but, while away, he called other dispatchers and persuaded them to help him find the boyfriend's whereabouts and later kills the former girlfriend and her new boyfriend. The Third Circuit held that the call center supervisor was not liable under Section 1983, because it had not being [sic] adequately alleged that he acted "affirmatively" so as to come within the state-created danger doctrine.)

(Doc. 67, p. 18).

the Corrections Defendants maintain that no dangerous situation existed in the kitchen on July 25, 2010, as the Food Service Department was in accordance with the proper safety standards. (*Id.*).

In his Brief in Opposition, Plaintiff argues that the Corrections Defendants did act affirmatively to create a danger of which he was a victim in acting with deliberate indifference. (Doc. 75, pp. 6-7). Plaintiff contends that when the Corrections Defendants directed him to clean the kitchen with the chemical at issue, "he had not choice but to either comply immediately, or go to the hole [RHU]." (*Id.* at p. 7). Plaintiff additionally submits that Defendants never informed the inmate-workers of the kitchen safety procedures or provided them with the proper safety wear because "they felt that THEY knew better" than the cleaning chemical manufacturers and the developers of DOC policy. (*Id.*).

Moreover, Plaintiff finds no merit in the Corrections Defendants' argument that he should have been aware of the appropriate procedures for handling the cleaning chemicals because he had cleaned in the kitchen for years. (*Id.*). He similarly refutes Defendants' argument that their position is justified because Plaintiff "speaks English perfectly well." (*Id.*). Plaintiff submits that the Medical Progress report dated May 1, 2006, demonstrates that he necessitated "an Inmate Interpreter," effectively contravening their argument outlined above. (*Id.*). Plaintiff further asserts that even if the rooms storing the cleaning chemicals were accessible by inmates, he would not have been able to read and understand the bottles' "complex terminology and instructions." (*Id.*).

Additionally, Plaintiff contends that the Corrections Defendants' classification of the chemical at issue as a "mild house cleaning detergent" further demonstrates "how much they view the minimalness (sic) of the dangers posed from such industrial chemicals in their concentrated

form." (*Id.*).

In their Reply Brief, the Corrections Defendants correctly reiterate that the state-created danger doctrine applies exclusively "to affirmative actions by the state entity, not mere negligence or failure to meet a certain standard of behavior." (Doc. 78, pp. 7-8). As support, the Corrections Defendants submit:

> As the United States Supreme Court noted in *DeShaney v. Winnebago County Dep't. of Social Services*, 489 U.S. 189, 202 (1989), the Due Process Clause does not transform every tort committed by a state actor into a constitutional violation. Further, the Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833, 848-9 (1998) stated in part:
>
> > "We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level..."

(Doc. 78, p. 8).

The Corrections Defendants contend that Plaintiff's allegation that they failed to act in accordance with the proper safety procedures amounts to only negligence, which, under *DeShaney*, does not comprise a constitutional violation or a state-created danger. (*Id.*).

Based on the undisputed evidence thoroughly discussed above, we agree entirely with Corrections Defendants and we do not find that Defendant Casey engaged in "conscience-shocking" behavior or that he acted with deliberate indifference to Plaintiff, and, accordingly, we will recommend that Defendant Casey be granted  summary judgment with respect to Plaintiff's

remaining Eighth Amendment claim against him.

The Supreme Court has held that, generally, the Due Process Clauses of the Fifth and Fourteenth Amendments "confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196. When the Due Process Clauses imposes a duty on the State to protect a specific citizen via a "special relationship," however, the State may be held liable for harm that may have been avoided had protection been afforded. *Id.* at 196-97, 198. Such a relationship exists between the State and an incarcerated prisoner, for example. *Id.* at 198-99. The Court has held that "because the prisoner is unable 'by reason of the deprivation of his liberty [to] care for himself,' it is only 'just' that the State be required to care for him." *Id.* (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976)). Because the Corrections Defendants in the instant case had a duty to care for Plaintiff as state actors, we analyze whether Plaintiff has shown disputed material facts with respect to his state-created danger claim against Defendant Casey.

The Corrections Defendants correctly lay out the elements of a state-created danger claim, as set forth by the Third Circuit in *Kaucher*:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger

to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

455 F.3d at 431 (quoting *Bright*, 443 F.3d at 281). *See also Andrews v. Monroe Cnty. Transit Auth.*, Civil Action No. 3:11-CV-1859, 2012 WL 1902573, at *4 (M.D. Pa. May 25, 2012); *Tri Thanh Nguyen v. Franklin County*, 2011 WL 7758230 (M.D. Pa. Dec. 16, 2011) adopted by 2012 WL 1378679 (M.D. Pa. April 20, 2012).

We find the second and fourth elements of the state-created danger doctrine to be dispositive in the instant action and will so recommend; however, we will nonetheless address each element. *See Andrews*, 2012 WL 1902573, at *4.

Courts in the Third Circuit hold that to effectively establish the first element of a state-created danger claim, *i.e.*, foreseeable and direct harm, a plaintiff must demonstrate "'an awareness on the part of the state actors that rises to the level of actual or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm'" and that the harm was "'a fairly direct result of the defendant's acts.'" *Id.* (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 238, 239 (3d Cir. 2008)).

With respect to the second element, while Third Circuit courts have not expressly defined what constitutes 'conscience-shocking' conduct, they have consistently found that "mere negligence will not 'shock the conscience' for purposes of establishing a substantive due process claim.'" *Andrews*, 2012 WL 1902573, at *5. *See also Schieber v. City of Phila*, 320 F.3d 409, 419 (3d Cir. 2003) ("[N]egligence is not enough to shock the conscience under any circumstances."). This Court has found that for conduct to rise to the level of conscience-shocking, "'the environment created by the state actors must be dangerous; they must know it to be dangerous; and ... [they] must have

been at least deliberately indifferent.'" *Andrews*, 2012 WL 1902573, at *5 (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997)). Regarding deliberate indifference, the Supreme Court has held:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness ... It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk ...

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994). *See also Knox v. Doe*, No. 12-2048, 2012 WL 2849653, at *1 (3d Cir. July 12, 2012) ("Deliberate indifference is proven by showing that a prison official 'knows of and disregards an excessive risk to inmate health or safety' [and] 'describes a state of mind more blameworthy than negligence.'"); *Ball v. Beard*, Civil No. 1:09-CV-845, 2011 WL 7148187, at *7 (M.D. Pa. Oct. 17, 2011) (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)) ("'Deliberate indifference is a subjective standard under Farmer – the prison office-defendant must actually have known or been aware of the excessive risk to inmate safety.'")

Here, we find that the undisputed evidence presented does not indicate that Defendant Casey actually knew of a substantial risk to Plaintiff's health and safety and then disregarded that risk. Further, we note that even if Plaintiff could demonstrate that Defendant Casey was aware of and disregarded such a substantial risk, Defendant Casey's failure to provide Plaintiff with appropriate safety gear would still not rise to the level of conscience-shocking conduct because

46

Third Circuit courts have consistently held that "mere negligence will not 'shock the conscience' for purposes of establishing a substantive due process claim.'" *Andrews*, 2012 WL 1902573, at *5. *See also Schieber*, 320 F.3d at 419. Thus, we do not find that Defendant Casey's conduct "shocks the conscience."

Pertaining to the third element of a state-created danger claim, *i.e.*, the foreseeability of the plaintiff, the Court recently held:

> To satisfy the "foreseeable plaintiff" prong, it need not be alleged that the state's actions placed a *specific individual* in danger. Rather, Plaintiffs can satisfy this element if [the allegedly harmed individual], "was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Morse*, 132 F.3d at 913. A "discrete plaintiff" may mean a specific person or a specific class of persons. *See id.* "The primary focus when making this determination is foreseeability."

*Andrews*, 2012 WL 1902573, at *6.

The fourth and final element of a state-created danger claim requires plaintiffs to prove that state actor defendants engaged in "'affirmative acts which work to the plaintiffs' detriment in terms of exposure to danger.'" *Id.* (quoting *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc)). The Third Circuit mandates that plaintiffs allege affirmative acts, "rather than inaction of omission." *Andrews*, 2012 WL 1902573, at *6 (citing *Bright*, 443 F.3d at 282). In *Andrews*, this Court held:

> The three necessary conditions to satisfy the fourth element of a state-created danger claim are that: (1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. [*Bright*, 443 F.3d] at 281-82. More fundamentally, there needs to be a "direct causal connection" between the acts or omissions of the state and the harm which befell the victim. *Morse*, 132 F.3d at 915.

47

2012 WL 1902573, at *6.

In the instant action, we find that Defendant Casey did not affirmatively act in failing to provide Plaintiff with appropriate safety gear. Accordingly, because we do not find, based on the evidence, that Defendant Casey's omissions rise to the level of conscience-shocking, affirmative conduct, we will recommend that Casey be granted summary judgment with respect to Plaintiff's remaining state-created danger claim against him. See *Tri Thanh Nguyen v. Franklin County*, *supra*.

*3. Defendants Davis & Jones — Eighth Amendment Claims Arising from Kitchen Incident*

As stated, we will recommend that Defendants Davis and Jones be granted summary judgment due to Plaintiff's failure to properly exhaust his administrative remedies with respect to his claims against these Defendants; however, we will nevertheless examine the parties' arguments regarding Plaintiff's claims against these two Defendants and make an appropriate substantive recommendation.

The Corrections Defendants' third argument is that Defendants Davis and Jones are entitled to summary judgment in their favor because a reasonable jury would be unable to determine that they acted with deliberate indifference regarding any serious risk of harm caused by the cleaning chemical to Plaintiff. (Doc. 67, p. 18). Defendants initially reiterate that all inmates working in the kitchen were oriented and instructed on safety and sanitation procedures. (*Id.* at pp. 19-20). In fact, as stated, Plaintiff signed an Inmate Job Assignment Orientation Form on May 28, 2010. (Doc. 69, pp. 86, 106-107). Further, Defendants Davis and Jones were not aware of any other inmate being harmed by cleaning chemicals while working in the kitchen, and, accordingly, they did not comprehend a serious risk of harm to Plaintiff in using the chemical cleaner. (Doc. 69 at pp. 94-95,

& 108).[27]

Specifically regarding Plaintiff's failure to protect claim against Defendants Davis and Jones, the Corrections Defendants submit:

> To establish a failure to protect claim, an inmate must demonstrate that he is (1) "incarcerated under conditions posing a substantial risk of harm;" and (2) the prison official acted with "deliberate indifference" to his health and safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To be deliberately indifferent, a prison official must have both known of and disregarded an excessive risk to the inmate's health and safety. *Id.* This standard is subjective and not objective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Wetzel*, 256 F.3d 120, 131 (3d Cir. 2001).
>
> The *Farmer* deliberate indifference standard is a high one. *Beers-Capitol*, 256 F.3d at 137. There must be "more than [an] ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835, citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986). In addition, the Constitution does not guarantee convicted felons a comfortable prison. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

(Doc. 67, p. 20)(alteration in original).

The Corrections Defendants initially argue that Plaintiff has failed to establish that the chemical disinfectant used to clean the kitchen posed a "serious risk of harm," as the disinfectant at issue is not considered to be a "caustic chemical," and Plaintiff did not suffer any serious burns to his eyes as a cause of the splash. (Doc. 67, p. 21). Plaintiff "only suffered a mild eye irritation, which was promptly treated by staff," and the subsequent surgery on his right eye pterygium was unrelated to the incident. (*Id.*). As discussed above, we agree with these contentions of Defendants based on the evidence.

---

[27]The Corrections Defendants stress that Plaintiff's injuries from the incident on July 25, 2010, included only a minor eye irritation, which received prompt medical treatment. (Doc. 67, p. 20). We find that the evidence detailed above supports Defendants' contentions.

Defendants find the facts of the instant action to be "in sharp contrast to those in other cases, where deliberate indifference by prison officials was found" and state:

> In *Farmer*, the Supreme Court reversed summary judgment for prison officials, where a preoperative transsexual inmate was beaten and raped by another inmate. In *Beers-Capitol*, the Third Circuit reversed summary judgment for a counselor, where juvenile offenders were raped by an employee of a detention facility. In that case, the counselor admitted she knew of the abuse against the juveniles, but did nothing. And in *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir. 1997), an inmate claimed that he was repeatedly assaulted and stabbed by other inmates. The Third Circuit reversed summary judgment for the prison officials, because there was evidence that the prison staff did not put into effect recommendations to place the plaintiff in protective custody. The Court rejected "the district court's conclusion that there was no evidence that Hamilton faced a substantial risk of serious harm." 117 F.3d at 747.

(Doc. 67, p. 21).

The Corrections Defendants submit that even operating under the assumption that the disinfectant at issue did pose a serious risk of harm to Plaintiff, Defendants Jones and Davis were not aware of this risk. (*Id.* at p. 22). In *Farmer*, the Supreme Court held that it is not sufficient for a inmate alleging a failure to protect claim to assert that prison officials should have been aware of a serious risk of harm; rather, these prison officials "must have actually concluded there was a risk and affirmatively ignored that risk." (*Id.*). Accordingly, the Corrections Defendants maintain that a reasonable jury would not be able to find that Defendants Davis and Jones acted with deliberate indifference to Plaintiff. (*Id.*).

The Corrections Defendants stress that SCI-Dallas's caustic cleaning chemicals were kept in a locked storage room that was unaccessible to inmates and that the disinfectant at issue was diluted with water. (*Id.*). in fact, Plaintiff told Defendant Casey that he splashed the chemical in his eye when he was mixing it with water in a bucket, and the chemical was not considered causitc and

50

was used to clean pots and pans. (Doc. 69, pp. 84 & 94). Further, the facility's Food Service Department had recently passed an ACA audit in which it was found to be complying with the proper safety and sanitation regulations. (*Id.*, p. 94). Defendants conclude that in accordance with these facts, "the Corrections Defendants cannot be said to have ignored any serious risk of harm to the Plaintiff or the other inmate workers employed in the kitchen." (Doc. 67, p. 22).

Moreover, the Corrections Defendants submit that Defendants Davis and Jones cannot be found liable under a theory of *respondeat superior* because, while both held supervisory positions, neither was working on July 25, 2010, the day of the incident. (*Id.* at p. 23, citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)). There is no dispute that Defendant Jones and Davis were not working on the day and time in question. (Doc. 69, pp. 94 & 107). Neither Defendant Davis nor Jones personally instructed Plaintiff to clean using the disinfectant at issue. (*Id.*).

In his Brief in Opposition, Plaintiff contends that Defendants Davis and Jones "both knew of and personally observed or participated in issuing concentrated chemicals without safety gear to the plaintiff and other prisoners." (Doc. 75, p. 8). Plaintiff further asserts that Defendants Davis and Jones "actively participated in" creating a precedent of not providing safety wear to inmate-workers, which ultimately caused Plaintiff's injuries." (*Id.*).

Even were we not to recommend that Defendants Davis and Jones be granted summary judgment due to Plaintiff's failure to exhaust his administrative remedies as against these Defendants, we would still recommend these Defendants be granted summary judgment because we find that the undisputed evidence shows these Defendants did not act with deliberate

indifference to Plaintiff's health and safety.

Defendants correctly find the two requirements for Plaintiff's claims against Defendants Davis and Jones in *Farmer,* namely: (1) Plaintiff "must show that he was incarcerated under conditions posing a substantial risk of serious harm"; and, (2) Defendants Davis and Jones must have acted with "'deliberate indifference' to [Plaintiff's] health or safety." 511 U.S. at 834. This Court recently held that the first element, or "the substantial risk prong of the inquiry," requires an objective analysis that "ordinarily will not be satisfied by evidence of a single incident or isolated incidents" but "may be 'established by much less than proof of a reign of violence and terror.'" *Simonton v. Tennis*, Civil Action No. 1:09-CV-0233, 2011 WL 941406, at *5 (M.D. Pa. Mar. 16, 2011) (quoting and citing *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985)). With respect to the second prong, "the question is whether an official consciously knew of and disregarded an excessive risk to the prisoner's well being." *Simonton*, 2011 WL 941406, at *5 (citing *Farmer*, 511 U.S. at 840-44). This awareness may be established *via* circumstantial evidence. *Simonton*, 2011 WL 941406, at *5 (citing *Beers-Capitol*, 256 F.3d at 131).

We find the record in the instant case fails to show that Defendants Davis and Jones "consciously disregarded a known risk" to Plaintiff's health or safety. *See Simonton*, 2011 WL 941406, at *6. As stated, "'[d]eliberate indifference describes a state of mind more blameworthy than negligence.'" *Knox*, 2012 WL 2849653, at *1. We find that Defendants Davis and Jones may have acted negligently, at best, but not with deliberate indifference. The Corrections Defendants correctly conclude that even a finding that Defendants Davis and Jones should have been aware of a substantial risk to Plaintiff's health and safety cannot sustain Plaintiff's Eighth Amendment

claims against them, as the Supreme Court has refused to adopt an objective test for deliberate indifference. *See Farmer*, 511 U.S. at 836-37. The record indicates that neither of these two Defendants were actually present for or were on duty during the incident that occurred in the kitchen on the morning on July 25, 2010. We further find that even if Plaintiff's allegations of lack of training and falsification of orientation documents prove factual, this may indicate that Defendants Davis and Jones were negligent in their omissions but still would not fulfill the "actual knowledge of a substantial risk requirement" of deliberate indifference.[28]

Accordingly, we will recommend that Defendants Davis and Jones be granted summary judgment on the merits of Plaintiff's Eighth Amendment claims against them.

### 4. Defendant Leskowsky — Denial of Proper Medical Care Claim

Finally, in their fourth argument, the Corrections Defendants argue that Defendant Leskowsky is entitled to summary judgment in his favor because a reasonable jury would not be able to find that he acted with deliberate indifference "to [the Plaintiff's] serious medical needs," as SCI-Dallas's medical records prove that Plaintiff received prompt treatment after the chemical splash, including being sent to the Emergency Room at Wilkes-Barre General Hospital. (Doc. 67, p. 23). With respect to Defendant Leskowsky, Plaintiff's Eighth Amendment claim that Leskowsky denied him proper medical care for his eye condition caused by the July 25, 201 incident remains. (Doc. 23, p. 10). Also, as stated, we have recently recommend that Defendant Dr. Bohinski's

---

[28]Although Plaintiff alleged that Defendants Davis and Jones had prior knowledge of incidents in which Plaintiff was required to use hazardous cleaning chemicals without appropriate safety gear, he has not presented evidence to support these allegations. Such unsubstantiated allegations are not sufficient at the summary judgment phase. *See Lockhart, supra*.

summary judgment motion be granted with respect to Plaintiff's Eighth Amendment claims that

Bohinski denied him prompt and proper medical care for his eye conditions existing prior to the

July 25, 2010 incident and for his eye injury caused by the incident.   (Doc. 89).

The Corrections Defendants correctly address deliberate indifference claims by inmates

against prison medical staff and state:

> Deliberate indifference is manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally delaying or denying access to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-4 (1976); *Coades v. Jeffes*, 822 F. Supp. 1189, 1191 (E.D. Pa. 1993). Negligent misdiagnosis or an inadvertent failure to provide care does not establish a constitutional violation. *Estelle*, 429 U.S. at 104-6; *McAleese v. Owens*, 770 F. Supp. 255, 257 (M.D. Pa. 1991). Mere disagreement with the type of medical treatment tendered does not amount to deliberate indifference. *Christy v. Robinson*, 216 F. Supp. 2d 398, 413 (D.N.J. 2002) (inmate failed to show misdiagnosis of arthritis condition); *Lindsay v. Dunleavy*, 177 F. Supp. 398, 402 (E.D. Pa. 2001) (failure to x-ray broken jaw not deliberate indifference). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106[.]

(Doc. 67, p. 24).

The Corrections Defendants again assert that Plaintiff was provided with appropriate medical

treatment for his right eye subsequent to the incident in the kitchen on July 25, 2010, and argue

that Plaintiff was denied proper care and Defendant Leskowsky was not deliberately  indifferent to

Plaintiff's eye condition. (*Id.* at pp. 24-25). Defendants further correctly point out  that the evidence

shows Defendant Leskowsky never personally treated Plaintiff or ever spoke to Plaintiff.  (Doc. 69

at p. 114).

In his Brief in Opposition, Plaintiff asserts that he intends to present at trial "testimony of the

officers who escorted him that when they contact[ed] the facility while he was at the hospital

[following the July 25, 2010 incident], they were instructed to remove him from the hospital and

to not allow any further treatment to be administered" because SCI-Dallas's own eye physician could examine Plaintiff "at a later date." (Doc. 75, p. 8). In his unsworn Declaration, Plaintiff alos states that he was told by correctional officers who escorted him to the hospital that he was going to be removed from the hospital before an eye doctor examined him on orders of the prison doctor and Defendant Leskowsky due to financial reasons. (Doc. 84). Plaintiff submits that such examination of his eye by an eye doctor at the hospital never occurred, which caused him to suffer a greater delay in medical treatment, generating "prolonged pain and suffering" and potentially increasing the risk of vision loss that he currently experiences. (Doc. 75, p. 8).

Plaintiff alleges that Defendant Leskowsky purposefully precluded Plaintiff from receiving necessary medical treatment after the July 25, 2010 incident. (*Id.*).[29] Plaintiff concludes that a jury should be charged with determining whether Defendant Leskowsky acted with deliberate indifference. (*Id.* at p. 9).

In their Reply Brief, the Corrections Defendants contend that Plaintiff raises new allegations against Defendant Leskowky in his Brief in Opposition that are contradicted by his own testimony during his deposition. (Doc. 78, p. 9). Specifically, although Plaintiff asserts in his Brief that Defendant Leskowsky instructed Plaintiff's escorting officers to remove him from the hospital after the July 25 2010 incident, Defendants stress that at his deposition, Plaintiff stated that he named Defendant Leskowsky in this action simply because "all of them work in the same union there." (*Id.*). The Corrections Defendants suggest that Plaintiff's new argument regarding Defendant

---

[29] Plaintiff cites: "Estelle v. Gamble, 429 U.S. 97, 130-104 (1976); Coades v. Jeffes, 822 F. Supp. 1189, 1191 (E.D. Pa. 1993)." (Doc. 75, pp. 8-9).

Leskowsky was "invented [ ] to bolster his case." (*Id.*). Plaintiff's deposition testimony reveals that Defendants have correctly stated the record. (Doc. 69, pp. 48-49). Further, according to Plaintiff's testimony, it appears that Plaintiff only sued Defendant Leskowsky based on *respondeat superior* since Plaintiff stated that Leskowsky was responsible when he (Plaintiff) was told at sick call his eye was okay, and to use the drops, creams and lubricant. (*Id.*).

Defendants continue, however, that even operating under the assumption that Plaintiff's new argument is true, Defendant Leskowsky still did not act with deliberate indifference, as he did not deny Plaintiff any medical care but, rather, provided him with a different eye physician "of the prison's choosing." (Doc. 78 at p. 10). We agree with Defendants that there is no evidence showing Defendant Leskowsy denied or delayed any medical care to Plaintiff for his eye condition.

In their Reply Brief, the Corrections Defendants request that the Court ignore Plaintiff's "various factual allegations in his opposing Brief," as they are unsworn and based on hearsay. (Doc. 78, pp. 5-6). The Corrections Defendants stress that federal courts consistently hold "that 'only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment.'" (*Id.* at p. 6 (quoting *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995)) (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000); *Blackburn v. UPS, Inc.*, 179 F.3d 81, 95 (3d Cir. 1999))). Defendants contend that while Plaintiff's Brief in Opposition partially relies on statements of hearsay, these statements would be inadmissible in court, and the Court should so ignore them in evaluating summary judgment. (Doc. 78, p. 6).

We agree with the Corrections Defendants and find that the evidence presented does not indicate that Defendant Leskowsky denied Plaintiff proper medical care or that Defendant Leskowsky acted with deliberate indifference to Plaintiff's health and safety, and, as such, we will recommend that Defendant Leskowsky be granted summary judgment with respect to Plaintiff's Eighth Amendment claim against him.

The Supreme Court has held that because an inmate is under the custody of the State, prison officials have a duty to provide adequate medical care to inmates when necessary, finding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' [ ], proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

In this context, this Court has held:

> The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In order to establish an Eighth Amendment medical claim, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need. *See Spruill v. Gillis*, 372 F.3d 218, 235-36 (3d Cir. 2004); *Natale v. Camden Cty. Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003). In the context of medical care, the relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective component) to (2) the plaintiff's serious medical needs (the objective component). *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987); *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1979). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347. "Additionally, 'if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment.'" *Young v. Kazmerski*, 266 Fed Appx. 191, 193 (3d Cir. 2008) (quoting *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347).

*Williams v. Klem*, Civil No. 3:CV-07-1044, 2008 WL 4453100, at *7 (M.D. Pa. Sept. 30, 2008).

We find that while Plaintiff's eye condition arising from the kitchen incident on July 25, 2010, may be considered "serious," the evidence presented does not indicate that Defendant Leskowsky was deliberately indifferent in attending to it. Initially, as mentioned, we note that it is undisputed that Defendant Leskowky never treated Plaintiff himself during Plaintiff's incarceration at SCI-Dallas. (*See* Doc. 69, p. 114). Accordingly, Plaintiff's denial of proper medical claim against Defendant Leskowsky, as it pertains to injuries arising from the incident in the kitchen on the morning of July 25, 2010, rests solely on his allegation that Defendant Leskowsky instructed the prison officers who escorted Plaintiff to Wilkes-Barre General Hospital to bring him back to SCI-Dallas before he was treated by the hospital's ophthalmologist.

The undisputed evidence demonstrates that upon splashing the cleaning chemical at issue in his eye, Plaintiff was immediately taken to the prison infirmary for treatment, where his eye was flushed with water and "sterile eye wash" for twenty (20) minutes before he was given a sterile eye dressing and ambulated to the emergency department at Wilkes-Barre General Hospital. ("Medical Incident/Injury Report," Doc. 69, p. 116). At Wilkes-Barre General's ER, Plaintiff's eye was again flushed, and he was seen by two (2) physicians and diagnosed with "eye irritation." ("Wyoming Valley Health Care System Discharge Instructions," Doc. 69, p. 119). Plaintiff was prescribed and given eye drops for his irritation and was instructed "to be rechecked by the eye doctor at [SCI-Dallas] this week." (*Id.*).

The Corrections Defendants also submitted evidence indicating that Plaintiff was seen by Defendant Dr. Bohinski in the infirmary the following day, July 26, 2010, where Plaintiff stated that

he felt "much better," although his eye was still "a little blurry." ("Progress Notes," Doc. 69, p. 134). Plaintiff was then treated in the infirmary for his eye irritation multiple times continuing into 2011. (*See* "Progress Notes," Doc. 69, pp. 123-139).

We further note that on the Material Safety Data Sheet for the chemical at issue that Defendant Casey allegedly provided to the medical department at SCI-Dallas in response to Plaintiff's July 25, 2010 incident, the recommended treatment for chemical contact with the eyes indicates as follows: "IMMEDIATELY FLUSH WITH PLENTY OF COOL RUNNING WATER FOR AT LEASE 15 MINUTES. GET MEDICAL ATTENTION." (Doc. 69, p. 59).

In conclusion, we find that the medical staff at SCI-Dallasf, supervised by Defendant Leskowsky, adequately provided Plaintiff with appropriate medical attention relating to his eye irritation caused by the chemical splash on July 25, 2010, and that the evidence presented does not indicate that Defendant Leskowsky displayed deliberate indifference by consciously disregarding a substantial risk to Plaintiff's health and safety. Accordingly, we will recommend that the Court grant Defendant Leskowsky summary judgment with respect to Plaintiff's Eighth Amendment claim against him.

Therefore, we will recommend that the Motion for Summary Judgment of Corrections Defendants (Doc. 66) be granted with respect to all of Plaintiff's remaining claims against them.

Finally, we agree with Corrections Defendants that to the extent the Court deems Plaintiff as having any remaining state law claims in this case, the Court should decline to exercise supplemental jurisdiction over them if it grants the Motion for Summary Judgment of Corrections Defendants since there will not be any remaining federal claims in this case.    *See* 28 U.S.C.

§ 1367(c)(3); *Verdecchia v. Prozan,* 274 F.Supp.2d 712, 728 (W.D. Pa. 2003).

**VI. RECOMMENDATION**.

Based on the above, it is respectfully recommended that the Corrections Defendant's **Document 66** Motion for Summary Judgment be granted in its entirety with respect to Plaintiff's remaining Eighth Amendment claims against Defendants Casey, Davis, Jones, and Leskowsky. We recommend that judgment be entered in favor of these Defendants and against Plaintiff.

         s/ Thomas M. Blewitt
         **THOMAS M. BLEWITT**
         **United States Magistrate Judge**

**Dated: September 27, 2012**

CARLOS ROBLES,                              :        CIVIL ACTION NO. **1:CV-10-2663**
                                            :
       Plaintiff            :        (Chief Judge Kane)
                                            :
       v.                   :        (Magistrate Judge Blewitt)
                                            :
J.J. CASEY, *et al.*,                       :
                                            :
       Defendants            :

_____        **NOTICE**

     **NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **September 27, 2012.**

     Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections may constitute a waiver of any appellate rights.

s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: September 27, 2012**